IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

DAVID E. DRAPER,            )
                            )
        Plaintiff,          )
                            )
    v.                      )       No. 13-cv-3233
                            )
CAROLYN W. COLVIN,          )
Commissioner of Social Security, )
                            )
        Defendant,          )

**REPORT AND RECOMMENDATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

On October 5, 2010, Plaintiff David E. Draper filed applications for Social Security Disability Insurance Benefits ("Disability Benefits") and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 423 1381a, and 1382c. The Defendant Commissioner determined that Draper was disabled as of his application date, October 5, 2010. The application date was the earliest date that Draper could be eligible for SSI benefits. Draper, therefore, was disabled for purposes of his SSI application.

The last day that Draper was insured for Disability Benefits, however, was March 31, 2010. To be eligible for Disability Benefits, Draper had to be disabled on or before March 31, 2010. The Commissioner determined

that Draper was not disabled before his application date, October 5, 2010. The Commissioner, therefore, denied Draper's application for Disability Benefits.

Draper appeals from the denial of his application for Disability Benefits. Draper filed a Motion for Summary Judgment (d/e 11), and Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e 14). This matter has been referred for a Report and Recommendation. Text Order entered May 29, 2014. This appeal is brought pursuant to 42 U.S.C. §§ 405(g). For the reasons set forth below, the decision of the Commissioner should be Reversed and Remanded.

## STATEMENT OF FACTS

Draper was born on November 3, 1962. He did not finish high school, but secured a GED. Answer to Complaint (d/e 7), attached Certified Transcript of Proceedings before the Social Security Administration (R.) 32-33, 36. Draper began working in 1980. From 1980-1982 and from 1984-2002, Draper worked at various jobs. Draper did not work in 2003. In 2004, Draper worked for Midwest Pallet in Beardstown, Illinois. He earned $3,698.25 that year. R. 162. Draper did not work in 2005. In 2006, Draper worked in Oklahoma. He earned a total of $1,418.16 in two different jobs. R. 161. He continued working in

Oklahoma in 2007.  He earned $14,125.73 at a drilling company that year. He earned an additional $341.50 with a company called Labor Finders.  In 2008, Draper returned to Illinois and earned $858.00 with a sanitation company.  R. 161.  Draper has not worked since.

On September 17, 2010, Draper's wife, Dawn Draper (Dawn), took Draper to the emergency room at St. John's Hospital in Springfield, Illinois. Draper was suffering from severe mental problems manifested by several symptoms, including hallucinations and delusions.  Dawn reported that Draper told her he was hearing three different voices.  Draper thought Dawn was taking him to the hospital to receive a lethal injection.  Dawn reported that Draper believed people were spying on him with cell phones. She reported that Draper had been talking to the radio and television and believed that the people on the television could see and hear him.  R. 286. Draper acknowledged that his behavior had been strange.  Draper denied any history of mental health treatment either inpatient or outpatient.  Draper reported that he took Prozac briefly years earlier, but did not like it.  R. 286-87.  The toxicology tests were negative for alcohol, opiates, or illegal drugs. R. 287.  Dawn reported that Draper's grandmother died three weeks earlier and Dawn's mother, Draper's mother-in-law, died two months earlier. Draper reported that he lived with his wife and three children.  He reported

that he was an unemployed truck driver. R. 287. Draper denied having any thoughts to harm himself or others. R. 288. Draper was diagnosed with bipolar disease with psychotic features. R. 289. The consulting physician determined that Draper needed to be hospitalized. R. 289.

The next day, September 18, 2010, Draper was hospitalized at the Methodist Medical Center of Illinois, located in Peoria, Illinois. Draper remained hospitalized until September 23, 2010. R. 290. During the admissions process, Draper thought that he was getting messages from the admissions staff member's computer. R. 297. Draper reported that he was also getting messages from music. He reported that he was depressed at a ranking of 10/10. He said his depression worsened because his two grandmothers died within the last year. He reported that he had not slept for three nights because he was afraid he would not wake up. During the evaluation, Draper began having a delusion and started talking to Jehovah, God and Jesus. R. 297.

Draper reported that his past medical history included a hospitalization for lacerations on his hands that he received in a knife attack during an argument with an intoxicated relative. He also reported that he once had glass removed from his right wrist and forearm. The

broken glass became imbedded when he punched a hole through a window during an argument. R. 294.

On September 18, 2010, Draper saw Dr. Andrew J. Lancia, M.D., while he was hospitalized. Draper reported to Dr. Lancia that he possibly took Abilify and Concerta in the past. Dr. Lancia considered this report to be unreliable. R. 297. Draper also remembered taking Prozac and Celexa in the past. R. 297. Dr. Lancia's impression was a 47 year old man with unclear psychiatric history. Dr. Lancia found that Draper's mood "has clearly degenerated recently, appearing not only depressed, but manic, with not sleeping, and psychotic delusions." R. 298.

The hospital's treatment notes for September 21, 2010 stated, in part, "He is volunteering a manic history today and suggests that he might indeed be bipolar." R. 320.

By September 22, 2010, Draper reported that he was not having any hallucinations. R. 320. By that time, he also did not overtly refer to any delusions. R. 290. On September 23, 2010, he was discharged with no suicidal ideations and no psychotic symptoms. R. 290. After his discharge, Draper continued to undergo treatment for his mental condition. See generally R. 378-402.

On May 22, 2012, the Administrative Law Judge (ALJ) held an evidentiary hearing. R. 28-70. Draper appeared in person and with by his attorney. Dawn appeared and testified at the hearing. Vocational expert Bob Hammond also appeared and testified.

Draper testified first at the hearing. Draper testified that he and Dawn were married and had three dependent children, ages 20, 17, and 15. Draper testified that the five of them lived in a mobile home. The youngest child received an SSI disability check due to attention deficit, ADHD. R. 33-34, 37. Draper testified that Dawn worked for the State of Illinois in a facility in Jacksonville, Illinois, that "takes care of mentally handicapped individuals." R. 38. Draper testified that he was determined to be disabled for purposes of SSI, but did not qualify to receive SSI because Dawn made too much money so the household income was too high. R. 38. Draper testified the he received health insurance through Dawn's employment. R. 39.

Draper testified that since 1997 he worked building and repairing pallets, driving a truck, working on an oil drilling rig. R. 39. He testified that he lost his driver's license in 2004 because of a DUI conviction in Ohio. R. 34-35. Draper testified that he believed the police in Ohio laid a trap for him to trick him, "You know, they just pulled a trick on me to get me pulled

over to begin with – was waiting on me on purpose." R. 49. Draper testified that the officers "took my whole career from me". R. 51.

Draper testified that his last job was with a sanitation company in 2008. He washed conveyor belts and machines with a high pressure hose. He testified that he only lasted three weeks at that last job. R. 39. Draper testified, "They moved me three times because they told me I couldn't do none of the lines right they kept putting me on. So it made me mad and I walked out and quit." R. 40.

Draper testified that he got along with all but one of his co-workers at the sanitation company job, "I got along with most of them just fine except for one old guy – he kept aggravating me because he kept complaining I didn't get my line clean and he made me mad and I throwed him up against the lockers in the locker room." R. 47. Draper testified that the co-worker he threw against the lockers did not report the incident to the supervisors. R. 48.

The ALJ asked Draper why he did not work after the sanitation job. Draper responded,

> I did live in Meredosia, Illinois. There's no jobs in Meredosia. And prior since then I attempted to get on a – to see if I was eligible for any disability, so I haven't worked because of that because I don't think it would look right if I was out working and waiting 16 months to see the judge, too, you know – I didn't think that'd go over as well.

R. 40. The ALJ asked Draper if he was able to work. Draper responded, "I don't know. So far I know that all the jobs I've had I seem to be a failure at then." R. 40.

Draper testified to a connection between the confrontation in the locker room while working for the sanitation company in 2008, and his prior work for trucking companies before he lost his license in 2004. Draper and his attorney had the following colloquy about this connection:

> Q    Okay. And what did your supervisor say about that incident?
>
> A    He never mentioned it to him.
> .
> Q    The guy you got into the confrontation with –
>
> A    Right.
>
> Q    Okay.
>
> A    That was the reason why the trucking company sent me to see a doctor to begin with was because I was in Poplar Bluff, Missouri one day delivering lawnmowers to Briggs & Stratton and they didn't want take their boards that went with their lawnmowers and so I got into with them over that and then I got into it with somebody that jumped in the turn lane before I could get into it, and I got out of the truck with my hammer and went up to his vehicle and let him know I had a hammer and that he couldn't just run over my truck any time he wanted. Some people do care, and I went back and got in my truck. So then they started calling me the hammer boy.
>
> Q    Okay.

> A   Another trailer I hit with my hammer and knocked a hole in it when I was lost one day.
>
> Q   So the trucking company asked you to see a doctor?
>
> A   Right.
>
> Q   Okay.
>
> A   Due to my emotional troubles.

R. 48-49.

Draper testified that he did not respond well to surprises. He testified, "Somebody catches you off guard and if you snap too quick, if you react instead of respond, then you're in trouble." R. 49.

Draper testified that he was hospitalized in September 2010 at his wife's insistence, because "I kept weirding out." R. 41. Draper's attorney asked Draper to define "weirding out." Draper testified that he could stay awake for three days and nights. He testified that he learned how to stay awake for long periods when he was driving a truck. R. 42.

Draper also testified that he did not want to go to his mother-in-law's funeral. He testified that she died in July 2009 and his grandmother died a year later. R. 43.

Draper testified that "it really freaked me out" when his grandmother died. R. 44. He testified that his grandmother died on July 27, 2010. R. 44. Draper testified,

> It really freaked me out and I thought people were saying things they were or weren't saying on TV when I'd watch TV and I fell down on the kitchen floor and I couldn't get up and the dog was licking me. Just all kinds of weird things was going on and my son and my daughter both and my wife was all three trying to get me to go to the mental place –

R. 44. Draper testified that, "if I stayed up for two or three days people would even start looking about like skeletons with hair and stuff on them to me on the television." R. 45.

Draper testified that he and his grandmother had confrontations in the 1990's "because she got this prisoner out of prison and felt sorry for him and he was 30 and she was in her 80s." R. 46. Draper continued, "This guy, he drank every day – whiskey and beer and they did all drugs and everything and – couldn't go see my grandma no more you know, half the time, so we had quite a few spats and stuff." R. 46.

Draper testified that the first person who told him he needed to get mental help was a dispatcher for a trucking company that employed Draper. Draper testified that, "My dispatcher said I needed to go see a doctor and see why I get so frustrated and angry." R. 44. Draper testified that he had problems finding both pick-up and delivery locations for his loads. Draper also testified that the people at the pickup and delivery locations "had real bad attitudes." R. 45.

Draper testified that his mother-in-law's funeral occurred right after he returned from Oklahoma, "from working on the drilling rig deal." R. 51. He testified that he worked "under the table" for a roofing company for six months at that time. Draper testified first that this occurred in November 2009. He then corrected himself and testified that the roofing job was in 2007. R. 52. Draper testified that he was fired from the oil rig job in Oklahoma because he would not sleep for several days at a time. He testified that his employer considered his lack of sleep a safety issue. R. 52.

Draper's testimony concluded with this colloquy with his attorney:

Q   All right. So, I'm asking you about 2009 and you're telling me about 2007.

A   Right.

Q   Can you remember to when your mother-in-law passed away?

A   Yeah.

Q   You can remember that? All right.

A   Yeah.

Q   Were you working at the time?

A   No.

Q   Why not? What was going on?

> A  I don't know. I can't even remember how long I've been taking medicine now.
>
> Q  All right.
>
> A  What was going on was nothing, just, I'd just came back from Oklahoma. I was other there for 18 months.
>
> Q  That was in 2007. I'm talking about 2009.
>
> A  I have no idea.

R. 52-53. At that point, Draper's attorney decided to call Dawn Draper to testify.

Dawn testified that she and Draper had been married for twenty-two years. They lived together for twenty of those years. She testified that they were separated from 2005 to 2007. R. 54. She testified that they were separated while he was working on the drilling rig in Oklahoma. R. 55. She testified that they have lived together since he returned from Oklahoma. R. 56.

Dawn testified that Draper started receiving mental health care when he was hospitalized in September 2010. Dawn testified that he always had anger issues. Draper's attorney asked her to identify when "things had gotten bad enough that he actually required help?" R. 56. She responded that things were bad when they separated. She testified that he was mellower when he returned from Oklahoma, "but it ended up back into it

again." R. 57. Draper's attorney asked her when she noticed that he was again having problems. She responded, "He had the biggest problems when his – I lost my mother in 2010 and he lost his grandmother a month later." R. 57. Dawn testified that her mother died on July 27, 2010, and Draper's grandmother died exactly thirty days later. R. 57-58, 64. She testified that those two deaths "really pushed him over the edge, it seemed like." R. 57. At that point, Draper was hallucinating and not acting rationally. R. 58-59. She testified that he has been much calmer since he has been taking his medications, but he also sleeps during the day. R. 58-59.

Dawn testified that Draper got pretty irrational in 2003 when the couple moved to Meredosia, Illinois. She explained,

> Well, he was just defensive if anybody said anything to him he didn't take it well. He couldn't get along with people. He was banned from both the gas stations down there. The landlord lived next door and there was a lot of confrontation with them.

R. 59-60.

Dawn testified that Draper moved to Oklahoma after she secured a restraining order against him to keep him away from her and their children. She testified that, "He was just so far out" that she could not have him around. R. 60. When Draper returned to Illinois, he lived with his

grandmother.  Dawn allowed the children to visit him there, and then, "I let him come back."  R. 60.

Dawn testified that Draper still had trouble dealing with people after he returned.  He had a confrontation with the landlord.  R. 61.  He had the confrontation with the co-worker at the sanitation company job.  At one point, he used cardboard to cover the windows in their home that faced the landlord's home.  R. 63.  Dawn testified that two years before the 2012 hearing, Draper also had a confrontation with the school principal and was not allowed on school premises.  R. 61.  Dawn testified that the deaths in the family "pushed him . . . to the point of no return."  R. 63.  She testified that the severe symptoms started "three to four months prior to getting treatment."  R. 64.

The vocational expert Hammond then testified.  R. 65-70.  The ALJ then concluded the hearing.

## DECISION OF THE ALJ

On May 25, 2012, the ALJ issued her decision.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a

severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined that Draper met his burden at Step 1. He had not engaged in substantial gainful activity since 2008. R. 21.

The ALJ determined at Step 2 that Draper failed to show that he suffered from a serious impairment on or before the last date that he was insured and eligible to receive Disability Benefits: March 31, 2010. The ALJ noted that Draper presented no medical evidence prior to the September 17, 2010, emergency room visit. The ALJ considered the testimony of Draper and his wife Dawn to infer when the impairments from the bipolar disease became severe. The ALJ found the testimony confusing, particularly about the dates of events. The ALJ found, however, that Dawn was clear that her mother died in July 2010, Draper's grandmother, died thirty days later, and Draper's symptoms deteriorated thereafter. R. 21-22. The ALJ found that all this occurred after the last date he was insured: March 31, 2010. The ALJ found at Step 2 that Draper was not disabled during the relevant time period for purposes of Disability Benefits. R. 22.

The ALJ, however, found that Draper was disabled as of the date of his application, October 5, 2010, and so, confirmed the prior determination that he was disabled for purposes of his SSI application as of that date. R. 23.

Draper appealed the decision of the ALJ. On July 2, 2013, the Appeals Council denied Draper's request for review. The decision of the ALJ then became the final decision of the Commissioner. R. 1. Draper then filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. In making this review, the Court considers the evidence that was before the ALJ. Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ also must develop a complete record in order to evaluate the claim. Howell v. Sullivan, 950 F.2d 343, 348 (7th Cir. 1991).

In this case, the ALJ erred by not developing a complete record. In circumstances in which: (1) the date that a claimant became disabled (Onset Date) is at issue; (2) the date must be inferred from the evidence; and (3) the medical history evidence is incomplete; then the ALJ should call on the services of a medical advisor to assist in the process of inferring the Onset Date. SSR 83-20. The Seventh Circuit held that the use of a medical advisor was imperative in such cases. In <u>Henderson ex rel. Henderson v. Apfel</u>, 179 F.3d 507 (7th Cir. 1999), the Onset Date was also at issue. The Seventh Circuit held that the ALJ in that case did not err by not securing the testimony of a medical advisor because the record had already contained extensive medical evidence. <u>Id.</u> at 513. The Seventh Circuit, however, said that a medical advisor must be used when the medical history evidence is incomplete:

> The ALJ already had an extensive medical history before him. An ALJ does have a duty to develop a "full and fair record," and <u>must therefore consult a medical advisor in situations involving incomplete medical histories</u> when an onset date must be inferred. But here the medical evidence is complete, and the evidence does not suggest a clear alternative date to that determined by the ALJ.

<u>Id.</u> (quoting <u>Howell</u>, 950 F.2d at 348.) (internal citations omitted) (emphasis added).

In this case, Draper was clearly disabled on September 17, 2010. He was delusional; he was hallucinating; he was severely psychotic. His Onset Date was some time prior to that date. Draper engaged in disturbing behavior for years. Prior to 2004 (the year he lost his driver's license), he threatened another driver with a hammer, he hit and damaged his own truck with a hammer, and he was banned from local gas stations because of his behavior. In 2005 or 2006, Dawn secured a restraining order to keep him away from her and their children because "he was just too far out." R. 60. Draper clearly was mentally disturbed to some extent at this time. No medical history prior to September 17, 2010, exists in the record to indicate when the impairment became either severe or disabling. The Seventh Circuit states that the ALJ, "must therefore consult a medical advisor in situations involving incomplete medical histories." Henderson, 179 F.3d at 513. The medical history is incomplete here. The ALJ erred by failing to enlist the services of a medical advisor to assist her in the process of inferring the Onset Date.

The Commissioner argues that this case is like Henderson. The Court disagrees. In Henderson, the medical evidence was extensive and no evidence indicated an alternative Onset Date. Id. Here, the medical history is almost non-existent and the testimony of Dawn and Draper both

indicate some level of mental disturbance for years prior to October 5, 2010. In this situation, the ALJ must enlist the assistance of a medical advisor to assist in inferring the Onset Date.

WHEREFORE, this Court recommends that Plaintiff Draper's Motion for Summary Judgment (d/e 11) should be ALLOWED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) should be DENIED. The decision of the Commissioner should be REVERSED and REMANDED pursuant to 42 U.S.C. §§ 405(g) sentence four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER: March 13, 2015

                              *s/ Tom. Schanzle-Haskins*
                        UNITED STATES MAGISTRATE JUDGE